Filed 7/29/15  In re A.S. CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.S., et al., Persons Coming Under the Juvenile Court Law. | |
| TULARE COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ASHLEY H.,<br><br>Defendant and Appellant. | F070661<br><br>(Super. Ct. Nos. JJV067332A; JJV067332B)<br><br>**OPINION** |

## THE COURT[*]

APPEAL from orders of the Superior Court of Tulare County.  Michael Sheltzer, Judge.

Lauren K. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kathleen Bales-Lange, County Counsel, John A. Rozum and Jason Chu, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*] Before Gomes, Acting P. J., Detjen, J. and Franson, J.

Ashley H. (mother) appeals the juvenile court's denial of her Welfare and Institutions Code section 388[1] petition and subsequent termination of her parental rights over her then four- and three-year-old sons, A. and Mark (collectively the boys).[2] She contends the juvenile court abused its discretion in denying the section 388 petition, and erred in declining to apply the beneficial parent-child relationship exception. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In the spring of 2012, the boys' maternal grandmother, Cecelia H., filed a petition for legal guardianship of the boys in probate court due to their parents' alleged drug use and lack of appropriate shelter. In May 2012, the probate court asked the Tulare County Health and Human Services Agency (Agency) to conduct an investigation. The Agency offered services to the parents, but they declined so Cecelia could be granted legal guardianship of the boys. Her guardianship petition was granted on August 24, 2012.

A year later, Cecelia petitioned to terminate the guardianship because she could no longer care for the boys due to her own mental and physical health. While that petition was pending, she returned the boys to mother's custody, as she thought mother was not using drugs and had a home. Shortly thereafter, Cecelia became concerned about the boys' welfare, as she and other people had seen mother roaming the streets with the boys, and Cecelia thought mother might be using illegal substances. On August 9, 2013, a social worker contacted mother and the boys at a home where she was renting a room from a friend; mother appeared to be meeting the children's basic needs. Mother admitted smoking marijuana on a daily basis and that she did not have a medical marijuana card; she agreed to submit to a random drug test and to receive services from the local Family Resource Center.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] The boys' father, Mark S., is not a party to this appeal.

Mother, however, failed to appear for the drug test, and she and the boys could not be located. On August 27, 2013, a family court hearing was held on Cecelia's petition to dissolve the guardianship. Due to concerns about the boys being in mother's care, the family court ordered Cecelia, or anyone with knowledge of the boys' whereabouts, to take them to the Agency's office when the boys were located.

An Agency social worker and a police officer eventually contacted mother and the boys at a motel on September 27, 2013. Mother admitted to marijuana and methamphetamine use, that she had untreated mental health issues, and she could not afford stable housing or properly care for the boys. Mother said she last smoked marijuana two days before, but she did not feel she was addicted to it. Mother said she smoked methamphetamine about a month ago and claimed she did not use it often, only when she felt the need. Mother had been diagnosed with depression, bipolar disorder and anxiety; she knew she should be on medication, but she could not afford it and had not taken it since A.'s birth. Mother, who was 25 years old, smoked marijuana to cope and "relax," but denied getting high from it as she had been smoking it since she was 15 years old. She had not received treatment for drug related issues. Mother agreed to being referred for services. The boys were placed into protective custody after Cecelia picked the boys up and took them to the Agency's office.

The Agency filed a dependency petition on October 1, 2013, alleging the boys came within the provisions of section 300, subdivisions (b) (failure to protect) and (g) (no provision for support). The Agency also filed a motion to terminate the guardianship. The boys subsequently were detained and placed together in a foster home.

The juvenile court appointed a Court Appointed Special Advocate (CASA), who visited the boys and prepared a report for the jurisdiction/disposition hearing. The foster mother reported that when the boys first arrived, they would cry through the night for more milk and were still drinking out of bottles. The CASA noted the foster mother's strict routine led to the boys' transition to drinking from sippy cups. The foster mother

3.

ran a daycare in her home; CASA believed the daycare was beneficial to the boys, as they were able to observe and learn from the other children. A. liked to be hugged and cuddled, would follow directions most of the time, and was not crying or throwing tantrums as often as when he first arrived. Both of the boys scored low in most developmental areas. Mark, who was receptive to direction and attentive to his surroundings, was receiving regional center services. The CASA noted the boys had made progress in their behaviors and skills since being placed in foster care, and recommended that A., whose speech was not clear, be assessed for eligibility for speech services through the school district.

At the November 15, 2013 combined jurisdictional and dispositional hearing, the parents submitted on the social worker's reports. The juvenile court found true allegations in an amended petition that (1) mother's history of abusing controlled substances, including marijuana and methamphetamine, and her untreated mental health issues rendered her unable to provide regular care for the boys, thereby placing them at substantial risk of suffering serious physical harm or illness, and creating a detrimental home environment; (2) father's substance abuse rendered him unable to provide the boys with regular care; and (3) the boys were left without provision for support since Cecelia no longer could provide care for them. The juvenile court granted the Agency's motion to terminate the guardianship with the agreement of counsel.

The juvenile court ordered reunification services for both parents. Mother's court-ordered case plan required her to participate in mental health counseling, complete a psychiatric medication evaluation, participate in parenting education, enroll in random drug testing, and complete a substance abuse evaluation and participate in recommended treatment. Mother was given supervised, twice weekly visits for two hours; the Agency was given discretion to increase the length and frequency of visits, but not to allow unsupervised visitation. The juvenile court explained to mother that the boys were the court's paramount concern, and it would consider allowing unsupervised visits if mother

4.

was able to make the boys her priority, stay clean from drugs, and get a job and housing. A six-month review hearing was set for May 7, 2014.

In reports prepared for the six-month review hearing, the Agency recommended termination of reunification services for both parents and that a section 366.26 hearing be set. Mother was not employed and was homeless; she came into the Agency's office once a month to check in with the social worker because she did not have a residence. Mother used public transportation to get to visits and case plan services. Mother was struggling to stabilize her mental health issues, as she had difficulty getting to Adult Mental Health for an assessment. Mother, who said she had been diagnosed with borderline personality disorder and bipolar disorder, reported self-medicating with marijuana because she did not want to take psychotropic medication, which she had taken in the past. Mother was honest about her marijuana use and had tested positive for it. According to the social worker, the initial risk factors that led to Agency involvement had not been reduced. Mother still wanted to reunify and acknowledged she needed time due to her untreated mental health issues. Mother said that doing all of her services at once had been overwhelming for her and she would need to take it slower if she were to be successful.

Mother had not completed any of her case plan components. On December 3, 2013, mother was referred to parenting education services, but she did not enroll in a program until February 24, 2014.[3] Mother, who had difficulty attending appointments due to transportation issues, had completed four sessions and missed four sessions. The Agency had provided her with bus passes, but mother had difficulty managing her time and catching the bus. Mother told the social worker she enjoyed the parenting class and wanted to be a better parent; the social worker noted that mother had utilized parenting techniques during visits.

---

[3] Subsequent references to dates are to the year 2014, unless otherwise stated.

Mother had not completed a substance abuse assessment or started treatment. Mother failed to attend the assessment scheduled on November 21, 2013. In January 2014, mother asked the social worker if she could delay the assessment until her mental health stabilized, as she felt overwhelmed with trying to get everything done. On March 12, mother told the social worker she was ready to begin treatment; the social worker referred mother for an assessment. On April 23, mother told the social worker she needed another referral for an assessment because she was 10 minutes late to the previously scheduled one. The social worker referred mother for another assessment, which was scheduled for April 28. Mother, however, failed to show up for this assessment. Since mother's referral for random drug testing on November 21, 2013, she had been called to test ten times; she showed up for testing only twice, on February 27 and May 6; both times she tested positive for marijuana.

Mother had been assessed for mental health services on January 28, and was to receive services at Tulare County Adult Mental Health. Mother failed to attend the first therapy session on February 18 and failed to attend an April 3 appointment with the psychiatrist. Mother did arrive for an April 29 therapy appointment, but the appointment was rescheduled to May 8 after the therapist had to leave work early. Mother did not attend the May 8 appointment. Mother told the social worker on May 12 that she had scheduled an appointment with her previous therapist, and she was going to obtain her mental health records to take with her to court.

The boys appeared to be thriving in their placement and making substantial progress. A. was receiving speech therapy services through the school district, where he was doing well. Mark was sleeping through the night and making progress in his regional center Bright Start program, where he was receiving help with his speech. The boys' speech had improved. The boys appeared to have a good relationship with the care providers, who said the boys were doing well in the home. An adoption assessment was completed on April 24, which found the boys adoptable. The care providers considered

adoption as the permanent plan.  While the adoptions social worker noted the boys were very attached to mother, the worker opined the boys would not suffer significant emotional detriment if parental rights were terminated and would not benefit from continuing their relationship with mother.

The Agency had not used its discretion to increase mother's visits because she was having a difficult time arriving to each visit and her mental health needed to be stabilized first.  Mother was on a 24-hour call to schedule visits, as the boys would become upset if mother did not show up; mother had been compliant with this system.  Mother was visiting about 75 percent of the time.  Accordingly to the visitation feedback forms, her visits were appropriate, she and the boys were affectionate towards each other, she played with the boys together and individually, and she was able to set limits with the children.  Mother was visiting on a weekly basis.

The Agency recommended termination of mother's reunification services because mother had not made substantial progress in her services and there was not a substantial likelihood the boys would be returned to her care if given additional services, as mother needed to stabilize her own mental health and address her substance abuse issues before she could be expected to parent her two young sons.

The review hearing was held on May 14, after being continued from May 7.  The Agency submitted on the reports.  Mother's attorney submitted after making some remarks.  He told the juvenile court it was mother's intention to file a section 388 petition "when appropriate."  Mother was still in the parenting program and hoped to make up the four classes she missed.  The social worker told mother to call that day for a new referral for a substance abuse assessment.  Mother had drug tested since the May 7 hearing and was calling regularly; she had signed the mental health assessment for the Agency and was beginning to attend.  The boys' counsel pointed out that, with the exception of the few weeks in August and September 2013, the boys had not been in mother's care for over two years.  The juvenile court recognized mother's lack of a parental relationship

7.

with the boys through much of their lives and considered the efforts mother made toward complying with her case plan, which were made more difficult by her homelessness and lack of transportation. Ultimately, the juvenile court followed the Agency's recommendation and terminated reunification services for both parents. The juvenile court advised mother, however, that it would reevaluate the issue if her attorney filed a motion in which she could "show a real sincere change in circumstances and not just your intention" and that there is, in fact, "a significant change in circumstances." The juvenile court set a section 366.26 hearing for August 27. Mother's visitation order was for supervised visits twice a week for an hour, with the Agency given discretion to increase the length and frequency.

In the "366.26 WIC Report" prepared for the August 27 hearing, the Agency recommended termination of parental rights and identified adoption with the current caregivers as the boys' recommended permanent plan. The caregivers, who had placement of the boys since the outset of the case, were committed to adopting the boys, who were adjusting well in their home and developing physically and mentally.

The boys reportedly enjoyed visits with mother, although she did not visit on a regular basis. Mother visited twice in June and six times in July. Occasionally mother's sister visited the boys as well. Mother was appropriate with the boys, interacted with them by sitting on the floor and playing with the toys she brought, and was able to redirect their behaviors when needed.

On July 15, mother called the social worker and demanded increased visits. Mother, however, had not provided the Agency with any verification as to her progress in her case plan services. Mother said she was drug testing and attending parenting classes, but she was not attending drug and alcohol classes, or mental health services. Mother said she was diagnosed with "split personality disorder" and no medication or therapy would help, and denied having a substance abuse problem. The social worker asked mother to provide copies of attendance at the parenting class and other progress reports

8.

which she would like the Agency to consider in exercising its discretion to increase visitation. On August 6, mother called the social worker's supervisor and asked for more visits, as she was going to her "program" and classes, and doing all the work she needed. Mother said she was trying to get her case plan progress to the social worker, but was having a difficult time. Mother yelled at the supervisor and ended the conversation by hanging up the phone.

An adoptions assessment was completed on August 6; the adoptions social worker found the boys adoptable and recommended they remain placed with their current caregivers with a permanent plan of adoption. The adoptions social worker again opined the boys would not suffer any significant emotional detriment if parental rights were terminated. The Agency reported that the boys looked to their caregivers, with whom they had a close relationship, to fulfill their needs, and the caregivers had provided for the boys' daily physical and emotional needs. It was clear to the Agency that mother was not ready to make significant changes in her lifestyle, as shown by her failure to address her substance abuse issues, her minimization of her mental health issues, and her explosive temper, and therefore could not be expected to parent the boys.

Mother appeared at the August 27 section 366.26 hearing; she requested a contested hearing and that the visitation narratives be provided. A contested hearing was set for September 24.

The Agency subsequently provided the visitation narratives that described mother's interactions with the boys between June 19 and July 24, and an update on mother's progress on her terminated services. On August 1, mother was admitted into a one year outpatient drug program, but by September 19 she was in danger of being terminated from the program due to excessive absences, as she had missed seven appointments. A drug testing summary showed mother had drug tested eight times between June 12 and September 18; the first five standard panel tests were positive for cannabinoid, while the last three tests, starting on August 22, were negative. As of

9.

September 18, mother had not provided the Agency with a progress report or certificate of completion as to the components in her previously ordered case plan services.

On September 24, the section 366.26 hearing was continued to October 8. On October 7, mother, through her attorney, filed a section 388 petition asking the juvenile court to: reopen mother's reunification services; increase the length and frequency of visits; and grant the Agency discretion to move to unsupervised visits, including overnight and weekend visits, in anticipation of an orderly and timely transition/return of the boys to mother's care under family maintenance.

As changed circumstances, the attorney summarized the services mother had been working on completing despite the termination of her reunification services. Mother was participating in an outpatient treatment program at New Heights through Central Valley Recovery Services, Inc. (CVRS), which she was admitted to on August 1 after her July 23 assessment. Mother missed sessions because she was unemployed and unable to afford the bus fare, or obtain other transportation, she needed to attend them; she also missed at least two sessions due to inaccurate scheduling of sessions by New Heights. As of September 29, New Heights was going to provide mother with a bus pass at the completion of each individual and group session so she could attend the next session. Mother was calling daily to drug test, but her number had not been selected since her September 18 negative test. Mother claimed she had not used any controlled substances since her last clean test on August 22. With a few exceptions, mother had regularly attended four NA/AA meetings per week, as required by the New Heights program, and obtained a sponsor.

Mother had not had time to seek and obtain treatment for any mental health issues, as she was overwhelmed with the services she had been doing voluntarily. Mother, however, had been told that the only treatment she needed for her borderline personality disorder was counseling, not medication. Mother had stopped self-medicating with

10.

marijuana, as she felt she no longer needed it.  Mother also felt her mental issues were not significant and did not interfere with her functioning.

Mother was actively seeking employment and was scheduled to complete the parenting program on October 6.  She had been visiting the boys every Tuesday afternoon for two hours.  She attended every scheduled visit, with the exception of two or three that were cancelled by either the Agency or the foster mother.  Mother was appropriate during visits, attentive to the boys, and she and the boys were affectionate with each other.

Mother's attorney asserted reopening reunification services would be in the boys' best interests because she and the boys loved each other very much and wanted to be together; since the boys' father was not participating in services, it would be emotionally tragic for the boys to not have at least one parent in their lives; the boys wanted to come home with her; and reopening services and expanding visitation would facilitate and expedite that outcome and make them a stronger family unit.

On October 8, the juvenile court set a hearing on the petition for October 17 and continued the section 366.26 hearing to that date.  Thereafter, the Agency filed a response to the petition, in which it asserted mother had not provided sufficient evidence to show she had made a significant change in circumstances.  With respect to substance abuse treatment, the Agency noted that mother only enrolled in the one-year program on August 1; mother demonstrated a lack of consistency and commitment to treatment, as she had been on the verge of being discharged from the program for excessive absences; and mother was not being completely truthful about her marijuana addiction, as it was inconceivable for her to say she does not feel she has a problem with marijuana when she has smoked it almost every day for the last 11 years to "take the edge off."  The Agency further asserted that mother had not shown a substantial time of sobriety, as she had tested positive for marijuana five out of the last nine drug tests, with the last positive test being on August 19.  The Agency attached an update for New Heights, which showed

11.

that, as of October 8, mother was attending two process groups per week to make up for missed appointments, as well as the required four AA/NA meetings per week, and was in compliance with the program.

The Agency noted mother had not provided evidence of enrollment or completion of mental health services, and asserted that mother's statement that she had not obtained mental health treatment because she felt overwhelmed showed her inability to follow through with her case plan should reunification services be reopened. Citing to articles from the internet website "WebMD," the Agency questioned mother's statement that she did not need medication to address her mental health issues and asserted mother minimized those issues. Mother had not provided the Agency with verification of enrollment or completion of the parenting program, or with any NA/AA meeting verifications.

The Agency asserted mother had not visited consistently in June and July, and while mother's visits had been changed to once weekly two hour visits in August, she only visited for one hour. The Agency argued that, while mother undoubtedly cared for her children very much, the issue was what was in the boys' best interest. The Agency pointed out that at the outset of the dependency, the boys' verbal skills were lacking, they were still on the bottle and they were not toilet trained, all of which were addressed and corrected after they were placed in the identified adoptive home. The Agency asserted the identified adoptive parents, not the biological parents, had assumed a parental role, and, as a result, the boys were thriving and stable in their identified adoptive home, and it was in their best interest to remain there.

Mother testified at the October 17 hearing. Mother disagreed with the Agency's statement that she did not visit regularly. She testified that she visited twice a week for one hour between June 16 and the beginning of August, when visits were changed to one two-hour visit per week because the boys had started preschool. If she missed a visit, it was because the Agency or the caregiver cancelled it. After the change in August,

12.

mother made every visit; she was on time for visits and never left early. Mother described the boys as loving and affectionate with her during visits and that they did not want the visits to end. Toward the end of each visit, the boys would tell her they wanted to go with her and it was not time for the visit to end.

Mother had completed her parenting education on October 6. Mother was still in her outpatient substance abuse treatment program through New Heights. Mother explained why it took her until August to begin treatment; in the first six months of services, she was homeless and worried about where she was going to stay. After her services were terminated, the program did not want to see her because she did not have a referral, so she got cleaned up and called them again; they agreed to evaluate her after she begged them to do so. She was assessed at the end of July and was told she needed an outpatient program. The outpatient program is 90 days, followed by up to a year of aftercare. Mother was two months into the program. She had missed some sessions because she did not have bus money. She asked the Agency for a bus pass even though her services had been terminated; they told her no. Mother then asked New Heights for help and they began giving her a bus pass at the end of each session; she had not missed a session since then. Mother attended AA/NA meetings four times a week, as required by the program. She had missed about seven meetings because she did not have bus fare, but she was starting to make them up. Mother had an AA/NA sponsor.

Mother was not employed; the last time she worked for someone was in 2008. She had been looking for work for at least six months without success. She put in applications twice a week, which is a requirement of the New Heights program. Mother had an interview with a temp service, who put her on their call list, but she had not yet been called.

Mother last used marijuana on July 7, and claimed she no longer used. Before July 7, she tested positive for marijuana, but since then, her tests were negative. Her last drug test was on October 7; she was drug testing on her own. Mother used marijuana to

13.

"take the edge off" having her boys taken; before then, she used it to sleep, as she had difficulty going to sleep because her mind would not stop. Mother denied using marijuana in the boys' presence; she used it in the evening outside the home while the boys were asleep inside. Mother did not feel she was under the influence of marijuana at that time or that her marijuana use interfered with her ability to think, act or take care of the boys.

Mother was diagnosed with borderline personality disorder by mental health when she started receiving reunification services and a psychiatrist diagnosed her with bipolar disorder when she was 19. The psychiatrist prescribed psychotropic medication, which she took, but she stopped going to the psychiatrist and taking the medication because she felt she did not need treatment. Mother was assessed for mental health services by county mental health in May 2014. It was recommended that she attend group therapy on a voluntary basis, but no medication was recommended. Mother had not attended any groups because she did not feel she needed them. Mother described bipolar disorder as having mood swings where you either really sad, really happy or really angry; she denied having such extreme mood swings. Mother described borderline personality disorder as seeing things black and white; mother did not feel she fit that description. Mother did not feel her mental conditions interfered with her ability to parent.

Mother felt she had a bond with the boys and that they were bonded to her. She believed it would be detrimental to them if they were adopted because the boys "love me with all their heart. And I would not be healthy. They would not understand why." Mother thought she would be able to parent the boys properly if they were returned to her care at some point, but she could not support them at that time. It would be beneficial to her and the boys if her services were reopened, as they have a "very strong bond" and they deserve to have her as their mother. Mother acknowledged having a problem with marijuana; despite that, she was able to stop using because she thinks of her boys and wants them.

On cross-examination, mother admitted she only started testing negative in the last two months, September and October, and that she did not attend any of the three referrals for substance abuse assessments that she received beginning in November 2013. She did not even try to begin services until August 1 and her program would not be completed until August 1, 2015. Mother admitted feeling overwhelmed in the past, as she had a lot of classes to do, but she did not feel her mental health was interfering. She denied still feeling overwhelmed and agreed that in the past, she indicated she did not have time to seek services. Mother went to mental health on October 13, and was told she did not need services there. Mother produced a "Notice of Action" from the Medi-Cal Specialty Mental Health Program, which stated that Tulare County's mental health plan had decided, after reviewing the results of an assessment of her mental health condition, that her condition did not meet the medical necessity criteria to be eligible for specialty mental health services through the plan because her condition did not cause problems for her in her daily life that were serious enough to make her eligible for such services. Mother did not believe she had a mental disorder, even though she had been diagnosed by a psychiatrist, which is why she does not take her medication.

According to mother, the only reason the boys lived with Cecelia for a year was because mother was homeless; mother also claimed that was the reason they were detained in September 2013. Mother, however, also admitted a probable reason for their detention was her testing positive for marijuana. Mother did not accept the offer of services in 2012, when Cecelia was trying to obtain guardianship, because the boys were going to live with Cecelia.

After oral argument on the petition, the juvenile court denied it, as mother had not met her burden of showing either a "significant change in circumstances or that it's in the best interest of the children to reopen reunification." The juvenile court recognized that mother had made strides. While the juvenile court did not believe mother met her burden of showing "changed circumstances, significantly changed circumstances," even

15.

assuming she had, she had not met her burden of showing it was in the boys' best interest to reopen services. The history of the case showed that while mother had a close, friendly, loving relationship with the boys, this was the eve of a section 366.26 hearing at which the focus has less to do with reunification services than with stability for the boys. The juvenile court explained: "There really has to be a significant showing of a change, a significant showing of best interest to shift that focus back to the effort to reunify. It is not that you haven't done anything. It is that what you have done is essentially too little, too late in terms of what's required to show in the showing of change of circumstances." Accordingly, the juvenile court found it was not in the boys' best interest to reopen reunification and denied the section 388 petition. The juvenile court continued the section 366.26 hearing to October 22.

At the section 366.26 hearing, the parties submitted on the reports and testimony at the prior hearing. The Agency asked the juvenile court to find the boys adoptable and terminate parental rights. Mother's attorney argued that mother had visited regularly, the visits had been good, and it would be detrimental for the boys to be adopted, as they were extremely attached to mother. Mother's attorney asked the court not to terminate parental rights, but to place the boys either in a legal guardianship or long term foster care. The boys' attorney agreed they were adoptable and noted mother's contact with the boys was limited to her ongoing visits. Other than the few weeks the boys were with mother in August 2013, the boys had been out of her care for over two years and in a stable home where they were being cared for by people who are fulfilling their needs and were willing to adopt them. The boys' attorney thought the boys deserved permanency and asked the court to follow the recommendation to terminate parental rights and proceed to adoption.

The juvenile court first considered whether the beneficial relationship exception to adoption existed. The juvenile court noted the boys, who were now three and four years old, were extremely young, around one and two years old, when they were placed into the guardianship, and therefore had spent a significant portion of their lives outside their

parents' care. The juvenile court further noted the boys were young, adoptable, and had been with a stable family since September 2013. Although the juvenile court believed mother was sincere in her feelings and had made efforts, the focus now was on the boys' stability and permanence; accordingly, it was compelled to find the boys' interest in permanency outweighed their interest in having a parental relationship. Even assuming mother regularly visited the boys, her relationship with them was more of a friendly, loving visitor than a parental one due to the length of time she was separated from the boys. Accordingly, the juvenile court reluctantly followed the Agency's recommendation, found the boys were likely to be adopted, terminated parental rights, and freed them for adoption.

## DISCUSSION

*The Section 388 Petition*

Mother contends the juvenile court erred by denying her modification request. Any party to a dependency proceeding may petition the court to modify or set aside a prior order on the grounds of change of circumstance or new evidence. (§ 388, subd. (a)(1).) The party must also show the proposed change would promote the child's best interest. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).) Section 388 provides a means for the court to address a legitimate change of circumstances, even at the permanency planning stage, while protecting a child's need for prompt resolution of his or her custody status. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)

Whether the juvenile court *should* modify a previously made order rests within its discretion and its determination may not be disturbed unless there has been a clear abuse of discretion. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 318.) The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. (*Id.* at pp. 318-319.) All conflicts in the record must be resolved in favor of the juvenile court's decision and all legitimate inferences indulged in to uphold that decision. (*In re Jason L.* (1990) 222 Cal.App.3d 1206, 1214.) When two or more inferences can reasonably be deduced

17.

from the facts, the reviewing court has no authority to substitute its decision for that of the trial court. (*Stephanie M., supra,* 7 Cal.4th at p. 319.)

Mother first contends the juvenile court erroneously injected an additional burden on mother that is not required by statute, as shown by its use of the words "significant" and "significantly" when explaining that mother failed to satisfy her burden of showing a "significant" change in circumstances or a "significant" showing of best interest. Mother asserts the statute does not require the petitioner to show a *significant* change in circumstances or to make a *significant* showing of best interest, but only requires a showing of a "change of circumstance or new evidence." (§ 388, subd. (a)(1).) By requiring her to show a significant change, mother argues, the juvenile court subjected her petition to an ambiguous level of scrutiny that the Legislature did not contemplate. Mother contends this was an error in the juvenile court's application of the statute, which is a question of law subject to de novo review. (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 535 [an appellate court reviews the interpretation of a statute de novo, which is a question of law]; *Robin J. v. Superior Court* (2004) 124 Cal.App.4th 414, 420 [same].)

While mother is correct that the statute does not state that the "change of circumstance or new evidence" must be significant, case law has made clear that not every change in circumstance justifies modification of a prior order. (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.) Instead, "[t]he change in circumstances must relate to the purpose of the order and be such that the modification of the prior order is appropriate[,]" i.e. "the problem that initially brought the child within the dependency system must be removed or ameliorated." (*Ibid.*) As explained in *In re A.A.*, "[t]he change in circumstances or new evidence must be of such *significant* nature that it requires a setting aside or modification of the challenged order." (*Ibid.* (italics added); see also *In re Mickel O.* (2011) 197 Cal.App.4th 586, 615; *Ansley v. Superior Court* (1986) 185 Cal.App.3d 477, 485.)

18.

Here, by stating that there had not been a significant showing of a change of circumstances or best interest, the juvenile court merely was reciting the well-established standard that requires not just any change, but a significant one, and that, because "[o]n the eve of a section 366.26 hearing, the child's interest in stability is the court's foremost concern, outweighing the parent's interest in reunification," a section 388 petition seeking reinstatement of reunification services must be directed at the child's best interest. (*In re Ramone R.* (2005) 132 Cal.App.4th 1339, 1348-1349.) The juvenile court did not, as mother argues, interpose its own standard after the evidence was demonstrated.

Moreover, any error was harmless under any standard of review. First, mother failed to establish a legitimate change of circumstances. With the exception of the parenting program, she had not completed any of her case plan components. At best, mother showed that her circumstances were changing, not that they had changed. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 48-49 (*Casey D.*) [court did not abuse its discretion in denying § 388 petition given mother's short drug recovery period and failure to complete prior treatment programs, which showed only changing circumstances].) Mother had a lengthy history of marijuana abuse and had been sober for only two months. Her sobriety at the time of the petition was untested since she had not yet completed her program. Although mother's developments were positive, they did not constitute changed circumstances.

Even assuming mother presented sufficient evidence of changed circumstances, there is no evidence that the boys' best interests would be served by another attempt at reunification. (*Casey D.*, *supra*, 70 Cal.App.4th at p. 47 [a petition alleging changing circumstances, which would lead to a delay in the selection of a permanent home, to see if a parent could reunify with a child eventually sometime in the future, does not promote the child's stability or best interest].) The boys, who had been out of mother's care for over two years, were placed together in the home of parents who wanted to adopt them.

19.

This placement allowed them permanency and the ability to be raised as siblings. Mother's argument that her pleasant visits promote the boys' best interest ignores their need for permanence and stability. Neither the juvenile court nor this court, however, may do so.

In sum, mother failed to satisfy her burden of showing changed rather than changing circumstances, and that reopening services would be in the boys' best interests. Thus, we find no error.

*The Beneficial Relationship Exception to Adoption*

Mother contends the juvenile court erred when it declined to apply the statutory exception to adoption of section 366.26, subdivision (c)(1)(B)(i), known as the beneficial parental relationship exception. She asserts she met her burden of proving both that she had regular contact with the boys, and the boys would benefit from continuing their relationship with her, such that it would be detrimental to the boys to terminate her parental rights.

There is a split of authority concerning the standard of review in this context. (See *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315 (*Bailey J.*) and *In re K.P.* (2012) 203 Cal.App.4th 614, 621–622 [hybrid combination of substantial evidence and abuse of discretion standards; applying substantial evidence test to determination of the existence of a beneficial parental or sibling relationship and the abuse of discretion test to issue of whether that relationship constitutes a compelling reason for determining that termination would be detrimental to the child]; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*) [substantial evidence test—"On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order"]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 (*Jasmine D.*) [abuse of discretion test].) Mother asserts the

substantial evidence standard of review applies to our review of the beneficial parental relationship exception, while the Agency asserts review is for abuse of discretion.

Our conclusion in this case would be the same under any of these standards because the practical differences between the standards are "not significant," as they all give deference to the juvenile court's judgment. (See *Jasmine D., supra,* 78 Cal.App.4th at p. 1351.) "'[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only "'if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he [or she] did.' . . .'"" (*Id.* at p. 1351.) Moreover, a substantial evidence challenge to the juvenile court's failure to find a beneficial parental or sibling relationship cannot succeed unless the undisputed facts establish the existence of those relationships, since such a challenge amounts to a contention that the "undisputed facts lead to only one conclusion." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1529 (*I.W.*); *Bailey J., supra,* 189 Cal.App.4th at p. 1314.)

Once the court determines a child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental under one of the statutory exceptions. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 809.) To avoid termination of parental rights under the parent-child relationship exception, the juvenile court must find "a compelling reason for determining that termination would be detrimental to the child" due to the circumstance that "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

The Court of Appeal in *Autumn H.* defined a beneficial parent/child relationship as one that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H., supra,* 27 Cal.App.4th at p. 575.) "[T]he court balances the strength and quality of

the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*)

A parent must show more than frequent and loving contact or pleasant visits for the exception to apply. (*In re C.F.* (2011) 193 Cal.App.4th 549, 555 (*C.F.*); *In re C.B.* (2010) 190 Cal.App.4th 102, 126; *I.W., supra,* 180 Cal.App.4th at p. 1527.) "The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent. [Citations.] Further, to establish the section 366.26, subdivision (c)(1)(B)(i) exception the parent must show the child would suffer detriment if his or her relationship with the parent were terminated." (*C.F., supra,* at p. 555.)

In this case, the juvenile court found that while mother had a loving relationship with the boys, she did not meet her burden of proving that adoption was not in their best interest. In so finding, the juvenile court noted the following: mother and the boys were attached to and loved each other, but the boys had been out of mother's home for over two years; due to the length of time that mother had been separated from the boys, her relationship with them was more of a friendly, loving visitor than a parent; the boys were adoptable and had been with a stable family since September 2013; and it was in the boys' best interest to have permanency. Accordingly, the juvenile court found mother's relationship with the boys did not promote their wellbeing to such a degree that it outweighed the wellbeing they would gain in a permanent adoptive home with new adoptive parents.

Mother asserts the juvenile court erred in so finding, citing to evidence that (1) during visits, the boys greeted mother with hugs and kisses, told her they loved her, and at the conclusion of visits, said they did not want the visits to end and they wanted to

go home with her; (2) mother acted appropriately during visits, brought appropriate food and toys, played with and read to the boys, and was able to redirect the boys' behavior if needed; and (3) mother believed it would be detrimental for the boys to be adopted because they loved her and would not understand. Mother asserts this evidence demonstrated the parental nature of their relationship and that the boys would benefit from continued contact with her.

Mother, however, ignores the other evidence that supports the juvenile court's decision. While mother visited the boys regularly and believed they were bonded to her, the boys had a close relationship with the identified adoptive parents, to whom they looked to fulfill their needs. Mother does not point to any evidence in the record demonstrating the boys had a consistent and positive relationship with her similar to a parent-child relationship. To the contrary, the record shows that mother had not acted in a parental role for nearly half of the boys' young lives. Moreover, there was no testimony or other evidence demonstrating a potential for harm if the boys were to lose their relationship with mother. The boys were very young; without termination of parental rights, they faced the prospect of tenuous placements for the bulk of their childhoods, which runs counter to their protected interests in permanence and stability.

On this record, we cannot say that no judge reasonably could have made the decision made here, or that the undisputed facts lead to only one conclusion.

## DISPOSITION

The orders denying the section 388 petition and terminating parental rights are affirmed.

23.